NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

14-1043


STATE IN THE INTEREST OF B.C. AND S.C.


**********


APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 2011-JU-96
HONORABLE DURWOOD W. CONQUE, DISTRICT JUDGE


**********


JIMMIE C. PETERS
JUDGE


**********


Court composed of Jimmie C. Peters, Marc T. Amy, and Elizabeth A. Pickett, Judges.


MOTION TO STRIKE DENIED; AFFIRMED.

Tracey Davenport-McGraw
Public Defender's Office
Fifteenth Judicial District
204 Charity Street
Abbeville, LA 70510
(337) 257-4669
COUNSEL FOR APPELLANT:
    C.C. (mother)

**G. Paul Marx**
**Public Defenders Office**
**Fifteenth Judicial District**
**Post Office Box 3622**
**Lafayette, LA 70502**
**(337) 456-1643**
**COUNSEL FOR APPELLANT:**
      **G.M. (father)**

**Annette F. Roach**
**Post Office Box 1747**
**Lake Charles, LA 70602**
**(337) 436-2900**
**COUNSEL FOR APPELLANT:**
      **G.M. (father)**

**Tamara D. Rahim**
**825 Kaliste Saloom Road**
**Brandywine 3, Room 150**
**Lafayette, LA 70508**
**(337) 262-1555**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana Department of Children and Family Services**

**Franchesca L. Hamilton-Acker**
**Acadiana Legal Service Corporation**
**Post Office Box 4823**
**Lafayette, LA 70502-4823**
**(337) 237-4320**
**COUNSEL FOR APPELLEE:**
      **B.C. (child)**
      **S.C. (child)**

**PETERS, J.**

C.C.[1] and G.M. appeal the trial court judgment terminating their parental rights to their minor children and certifying the children as available for adoption. For the following reasons, we affirm the trial court judgment in all respects.

## DISCUSSION OF THE RECORD

The minor children at issue in these proceedings are B.C., who was born on February 27, 2010, and S.C., who was born on January 12, 2011. Both children came into the custody of the State of Louisiana, Department of Children and Family Services ("DCFS") on September 21, 2011, when DCFS obtained an instanter custody order from the trial court based on assertions of neglect. Specifically, DCFS asserted that it had been notified by the children's relatives that C.C. and G.M. left the children with relatives who did not agree to care for them, and in doing so, failed to provide the relatives financial support or contact information. DCFS further asserted that the parents were homeless, without any means of transportation, and on probation for domestic violence; C.C. was not taking her mental health medication as prescribed; B.C. was developmentally delayed and had missed several appointments with the agency addressing that situation; and the children were behind on their immunizations.

At a continued custody hearing held on September 26, 2011, C.C. and G.M. stipulated with DCFS that the children should remain in DCFS's custody. A hearing held on October 24, 2011, resulted in a trial court judgment adjudicating the two children to be children in need of care. This judgment was also by stipulation of the parents and DCFS; and DCFS filed into the record a case plan

---

[1] Pursuant to Uniform Rules—Courts of Appeal, Rules 5-1 and 5-2, the initials of the parties will be used to protect and maintain the privacy of the minor children involved in this proceeding.

completed on October 7, 2011. This was the first of many case plans to be prepared and implemented by DCFS. The dates of these case plans are as follows:

- October 7, 2011
- March 6, 2012
- September 4, 2012
- December 14, 2012
- February 1, 2013
- May 6, 2013
- August 12, 2013
- February 7, 2014

These case plans were considered at a number of permanency and review hearings held on the following dates:

- March 12, 2012
- September 17, 2012
- December 17, 2012
- February 4, 2013
- March 6, 2013
- July 22, 2013
- September 16, 2013
- February 24, 2014

At each of these hearings, the trial court approved the case plans presented, and the parents stipulated that the children's custody should remain with DCFS.

Paternity tests performed after DCFS obtained custody of the two minor children revealed that while G.M. is B.C.'s biological father, he is not S.C.'s biological father. On July 8, 2013, and based partially on the results of the paternity tests, DCFS filed a petition to terminate the parental rights of C.C. and G.M., but added the biological father of S.C. as an additional defendant. After granting three continuances to allow the parties more time to comply with the requirements of the case plans, the trial court heard the termination proceeding on June 23, 2014. Upon completion of the evidence, the trial court rendered judgment terminating the parental rights of C.C. as to both children; terminating the parental

rights of G.M. as to B.C.; and terminating the parental rights of the father of S.C. as to that child. In its written reasons for judgment, the trial court stated:

> The court finds that there is clear and convincing evidence presented of valid grounds for termination under LA Children's Code Article 1015(5). LA CH C art 1015(5) states that, unless sooner permitted by the court, when at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services that has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home, then termination is warranted. Part C specifically says, under Art 1015.5 (sic), lack of parental compliance with the case plan may be evidenced by one or more of the following, of which the court finds there is clear and convincing evidence,
>
> 1) The parents have failed to comply with the required program of treatment and rehabilitation services provided in the case plan.
>
> 2) The parents suffer from mental illness and/or substance abuse or chemical dependency which renders them unable/or incapable of exercising parental responsibilities without exposing the minor children to a substantial risk of serious harm, based on expert opinion and/or based upon an established pattern of behavior;
>
> 3) The parents' lack of substantial improvement in redressing the problems of preventing reunification
>
> 4) The parents conduct reasonably indicates that they are unable or unwilling to provide an adequate permanent home for the minor children based upon an established pattern of behavior; and
>
> 5) The conditions that led to the removal or similar potentially harmful conditions continue to persist.
>
> ….
>
> Pursuant to the allegations set out in LA Children's Code Article 1015 having been proved by the evidentiary standards required by LA Children's Code Article 1035 & 1036, the court now finds it is in the best interest of the children at this time to terminate the rights of the mother, [C.C.], the fathers, [G.M.], of the minor child, [B.C.], and

[S.B.], of the minor child, [S.C.] and to certify them eligible for adoption.

After the trial court executed a July 9, 2014 judgment corresponding to its reasons for judgment, C.C. and G.M. perfected this appeal, with C.C. asserting three assignments of error and G.M. assigning two. In her assignments of error, C.C. asserts:

1. The trial court erred in finding that the Department proved by clear and convincing evidence that at least one year had elapsed since the children were removed from appellant's custody pursuant to a court order, in accordance with article 1036.1 of the Children's Code.

2. The trial court erred in finding that the department proved by clear and convincing evidence that appellant had not substantially complied with her case plan; and that there was no reasonable expectation for further improvement in her condition or conduct in the future.

3. The trial court erred in finding that termination of C.C.'s parental rights was in the best interest of her children because of their attachment to the foster parents, where the department failed to prove any element of 1015(5) by clear and convincing evidence.

G.M. asserts in his assignments of error that:

1. The trial court erred in terminating the parental rights of G.M. The court erred in concluding that G.M. had not substantially complied with his case plan and that there was no reasonable expectation for future improvement in his condition or conduct in the near future nor expectation that he would complete any new requirements of the case plan as deemed necessary for the safe return of the child.

2. The trial court erred in finding that termination was in the best interest of the child, B.C.

## MOTION TO STRIKE

In addition to her three assignments of error, C.C. filed in this court a motion to strike certain portions of the appellate record now before us, as well as certain portions of another appellate record in which we have rendered a separate opinion

this day. *State ex rel. J.C.*, 14-1044 (La.App. 3 Cir. ___/___/15) (unpublished opinion). This other opinion involves the termination of C.C.'s parental rights to a third child, J.C. (born June 10, 2012).

In the matter now before us, C.C. asserts that all of the appellate record relating to the children in need of care (CINC) proceedings that preceded the termination proceedings should be stricken and this court consider only those portions of the appellate record which relate to the termination proceedings. She bases her request for this relief on the assertion that DCFS never introduced the CINC proceedings at the trial on the termination issue; the trial court never commented that it was taking judicial notice of the CINC proceedings; and DCFS did not designate the CINC proceedings to be included in the appellate record.

With regard to C.C.'s request to strike all of the pleadings relative to B.C. and S.C. except the termination pleadings themselves, for the reasons set forth in this opinion considering C.C.'s first assignment of error, we deny this portion of the motion.

## OPINION

Louisiana appellate courts review a trial court's findings regarding the termination of parental rights under the manifest error standard of review. *State ex rel. K.G.*, 02–2886 (La. 3/18/03), 841 So.2d 759. Accordingly, a reviewing court must review the record in its entirety to determine whether a trial court's finding was clearly wrong or manifestly erroneous. The issue to be resolved by an appellate court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Stobart v. State through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993)

5

The laws of this state recognize that in any involuntary termination of parental rights proceeding, there are two private interests involved: those of the parents and those of the child. *State ex rel. J.A.*, 99–2905 (La. 1/12/00), 752 So.2d 806.

> The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent.

> The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven.

*Id.* at 810–11 (internal citations omitted).

Termination of parental rights requires a two-prong inquiry: first, the state must establish one of the enumerated grounds for termination, and second, the trial court must then find that termination of parental rights is in the best interest of the child. *State ex rel. S.M.*, 98-922 (La. 10/20/98), 719 So.2d 445; La.Ch.Code art. 1039. Additionally, the state must prove each element of one of the enumerated

grounds for termination by a showing of clear and convincing evidence. La.Ch.Code art. 1035. Louisiana Children's Code Article 1015 lists the statutory grounds by which a court may terminate an individual's parental rights and the trial court in the matter before us based its decision on the provisions of La.Ch.Code art. 1015(5), which reads as follows:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

### C.C.'s First Assignment of Error

In her first assignment of error, C.C. argues that DCFS failed to establish by clear and convincing evidence the first element of proof required by La.Ch.Code art. 1015(5), that "at least one year had elapsed since the children were removed from [the parent's] custody pursuant to a court order[.]" She argues that DCFS failed to offer into evidence the court order which caused the year period to commence to run. In making this argument, she relies on the provisions of La.Ch.Code art. 1036.1, which provide that:

> A.    Evidence of a prior adjudication or a parent's prior stipulation that a child is in need of care and an instanter order or disposition judgment removing the child from the parent's custody shall be admissible in proceedings brought under this Title. If the prior adjudication judgment was entered by the same court, it may take judicial notice of its own records. If the prior order or judgment was entered by another court, a certified copy of the order or judgment or certified copy of the minute entry shall be admissible in accordance with the Louisiana Code of Evidence.
>
> B.    The court record of a prior child in need of care proceeding involving the child who is the subject of the termination

proceeding may be introduced into evidence at the hearing on the termination of parental rights.

The record does reflect that DCFS failed to offer a certified copy of any prior court order and failed to offer the CINC proceedings into the record at trial; and the trial court did not expressly take judicial notice of the CINC proceedings. However, in its written reasons for judgment, the trial court specifically stated that "[t]he minor children came into the custody of the Department of Children and Family Services on September 21, 2011 on the grounds of neglect by dependency and lack of adequate supervision; they were adjudicated 'Child in Need of Care' by judgment entered on October 24, 2011." Thus, while the trial court did not use the specific phrase "judicial notice," it is clear that it took judicial notice of its own records in rendering judgment.

Furthermore, testimony adduced at the termination hearing, without objection from C.C., established that the children were removed from the custody of C.C. and G.M. on September 21, 2011. While La.Ch.Code art. 1036.1 provides that a prior instanter order or dispositional judgment may be used as evidence of a prior adjudication or parental stipulation, it does not state that its provisions are the only way for establishing this element of proof. We find that the trial court did not err in finding that DCFS proved by clear and convincing evidence that at least one year had elapsed since the children were removed from C.C.'s custody pursuant to a court order, in accordance with La.Ch.Code art. 1036.1. Accordingly, C.C.'s first assignment of error lacks merit.

### C.C.'s Second Assignment of Error and G.M.'s First Assignment of Error

In their respective assignments of error, C.C. and G.M. both assert that the trial court erred in finding that DCFS established by clear and convincing evidence

two other elements of proof required by La.Ch.Code art. 1015(5), that they [C.C. and G.M.] had not substantially complied with their case plans and that there was no reasonable expectation for further improvement in their condition or conduct in the near future. For the following reasons, we find these assignments of error to be without merit as well.

Louisiana Children's Code Article 1036 provides in pertinent part:

C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
…
(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
…
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based on expert opinion or based upon an established pattern of behavior

As previously noted, eight case plans were created for C.C. and G.M. and approved by the trial court from the time the children were removed from their custody until the time of the termination hearing. Both C.C. and G.M. have had almost three years to complete their case plans and make changes to their lifestyle that would permit DCFS to move forward with reunification.

9

Lindsey Gleason, a DCFS caseworker assigned to this matter, testified at the termination proceeding that the components of the eight case plans were standard in that they included the obligation of the parents to maintain safe, adequate, and stable housing; maintain an adequate income and provide proof thereof; pay parental contributions of $10.00 a month; submit to mental health and substance abuse evaluations; attend anger management and parenting classes; and maintain contact with DCFS. However, both C.C. and G.M. had been unable or unwilling to comply with even these very basic requirements.

According to Ms. Gleason, C.C. maintained thirteen different residences since the children's removal and, at the time of the termination hearing, was residing with a new boyfriend and his parents. This new living arrangement created additional problems because the new boyfriend's parents refused to be fingerprinted. The requirement that all adults in the household be fingerprinted was part of the case plan and, according to Ms. Gleason, C.C. was well aware of this requirement but made only minimal attempts to find other housing and eliminate the problem. Ms. Gleason also found no impediments to C.C. finding gainful employment other than the lack of effort on her part.

C.C., according to Ms. Gleason has been diagnosed with borderline intellectual functioning, bipolar II, and borderline personality features. She has been prescribed Zoloft, Abilify, and Remeron, but does not take the medication as prescribed. In addition, Ms. Gleason testified that DCFS reached the conclusion in working with C.C. that she had not sufficiently demonstrated her ability to parent her children despite the services and classes she received. There had been no improvement in this area since the children were taken into custody, and Ms. Gleason testified that she doubted if there would ever be any improvement.

Monique Eller, Resource Manager for DCFS, testified that C.C. had difficulty handling all three children together and that visits with the children were never extended past one hour. According to Ms. Eller, there was no difference between the first visit she supervised and the last, and she doubted that the situation would improve.

With regard to G.M., Ms. Gleason testified that he had moved fourteen times since the children were removed from his custody and, at the time of the termination hearing, he was sleeping on the kitchen floor of a mobile home that housed three other adults and one teenager and was making no effort to find other housing. His excuse, according to Ms. Gleason, was that his poverty prevented him from doing so. Ms. Gleason testified that although G.M. was employed at Wal-Mart, his only voluntary parental support contribution was one $40.00 payment in 2012. She did acknowledge that support payments were deducted from his pay checks every month, but she was not sure if those deductions were for current obligations or back support.

After thoroughly reviewing the record, we conclude that the trial court did not manifestly err in finding that DCFS proved by clear and convincing evidence that C.C. and G.M had not substantially complied with their case plans and that there was no reasonable expectation of significant improvement in their conduct in the near future. The record supports the determination that C.C. and G.M. repeatedly failed to comply with their respective case plans, showed a lack of substantial improvement in the problems preventing reunification, and that the conditions that led to removal or similar potentially harmful conditions continued to persist. The record also supports the trial court's determination that C.C. suffers from mental deficiency that renders her incapable of exercising parental

11

responsibilities without exposing her children to substantial risk of harm, based on her established pattern of behavior. Furthermore, there is clear and convincing proof evidencing that neither parent is able to provide an adequate permanent home for their children based on their established patterns of behavior. Accordingly, for these reasons, we find C.C.'s second assignment of error and G.M.'s first assignment of error to be without merit.

### C.C.'s Third Assignment of Error and G.M.'s Second Assignment of Error

In their final assignments of error, C.C. and G.M. assert that the trial court erred in finding that termination of parental rights was in the best interest of B.C. and S.C. However, for the reasons previously expressed and the following reasons, we find that these assignments of error lack merit.

B.C. and S.C. have spent the majority of their lives in foster care, and they have been placed with their current foster parents since 2012. At the termination proceeding Ms. Gleason testified that B.C. and S.C. were bonded to their foster parents. They refer to the foster parents as "mom and dad" and consider them to be their parents. Ms. Gleason also testified that the children looked to the foster parents, rather than C.C. and G.M., to satisfy any need they may have had during the supervised visits. She stated that the children were thriving in the care of the foster parents. When asked whether it was in the children's best interest to remain in the same home, Ms. Gleason answered that she thought it would be detrimental for the children to be separated.

Ms. Eller corroborated the fact that the children look to the foster parents to have their needs met. She testified that it was clear to her that the children's primary attachment and safe place is with the foster parents, and they were clearly bonded to them. Annette Romero, a CASA volunteer, testified that the children's

condition has vastly improved in the care of the foster parents, and that it was in the best interest of the children to remain in the care of the foster parents. In its oral statements at the termination proceeding, the trial court noted that the child's best interest was a "very, very strong factor in this case." The trial court acknowledged the parents' love for their children, but noted the long amount of time it had taken them to make any sort of progress in this case, if any had been made. The court stated, "[A] child also recognizes what it needs and goes back to the people that can provide that need. Unfortunately for you, you are not those people in these children's lives at this point." Accordingly, we find no manifest error in the trial court's determination that DCFS proved by clear and convincing evidence that termination of parental rights of C.C. and G.M is the best interest of B.C. and S.C.

## DISPOSITION

For the foregoing reasons, we deny the motion to strike and affirm the judgment of the trial court terminating the parental rights of C.C. and G.M. to minor children B.C. and S.C. and certifying them for adoption. We assess all costs of this appeal to C.C. and G.M.

**MOTION TO STRIKE DENIED; AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.